IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 21, 2006 Session

## GORDON C. COLLINS v. BARRY L. ARNOLD, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 02C-807     Hamilton V. Gayden, Jr., Judge**

---

**No. M2004-02513-COA-R3-CV - Filed November 20, 2007**

---

The plaintiff was severely injured when the automobile he was driving was struck by a car driven by an impaired driver who was killed in the collision. The plaintiff's suit named as defendants the estate of the deceased driver, the nightclub from which the driver departed immediately before the accident, and the company which provided security services to the bar. The jury declined to find the nightclub liable for serving alcoholic beverages, thereby making the only available basis for liability negligence in controlling the conduct of the deceased driver so as to prevent harm to others. The jury heard evidence that employees of the club and the security company had made efforts, albeit unsuccessful, to prevent the driver from leaving the premises in an intoxicated state. The jury found the plaintiff's damages resulted from negligence and amounted to over $1,162,000. They allocated 30% of the fault to the deceased driver, 30% to the security company, and 40% to the club's owner. The jury also awarded punitive damages of $1.5 million against the club's owner and $500,000 against the security company. The club owner appealed. Because the jury was not instructed as to the conditions for liability under an assumed, rather than imposed, duty of care as established in Section 324A of the Restatement of Torts, we must reverse the verdict and judgment thereon. For separate and independent reasons, we reverse the award of punitive damages, because the conduct of the bar's personnel in attempting to prevent its adult customer from driving while impaired did not reach the level of recklessness necessary to sustain a punitive award. Additionally, we find no error in evidentiary rulings or other procedures in the trial court that justify reversal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. WILLIAM C. KOCH, JR., P.J., M.S., filed a concurring opinion in which FRANK G. CLEMENT, JR., J. joined.

J. Randolph Bibb, Jr., Brigid M. Carpenter, G. Douglas Tackett, Jr., Nashville, Tennessee, for the appellants Barry L. Arnold, et al.

William D. Leader, Jr., Joseph G. DeGaetano, Nashville, Tennessee, for the appellee, Gordon C. Collins.

**OPINION**

# I. BACKGROUND

This lawsuit arose from a tragic accident that occurred at about 11:15 p.m. on October 24, 2001. Brett Arnold, who had just reached the age of twenty-one, was driving a Jeep Grand Cherokee at high speed on Briley Parkway in Nashville. His vehicle crossed the median and collided violently with a Nissan Maxima driven by the plaintiff, Gordon Collins. Brett Arnold died in the collision. Gordon Collins was severely injured. He had to undergo surgery for hip and facial fractures, and he underwent months of painful rehabilitation. He ultimately had a good recovery, but residual pain and impairments to his vision and mobility have permanently restricted his ability to practice his profession as a photographer.

Mr. Collins filed a timely complaint against the estate of Brett Arnold and against Brett Arnold's father, Barry Arnold, who was the registered owner of the vehicle and is the executor of his son's estate. The complaint asked for both compensatory and punitive damages. Mr. Collins subsequently learned that shortly before the accident Brett Arnold had been a patron of a bar in Madison named Denim & Diamonds. An autopsy on Brett Arnold's body revealed a blood alcohol concentration of 0.119%, well in excess of the legal limit.

Mr. Collins amended his complaint, adding Graham Brothers Entertainment of Nashville d/b/a Denim & Diamonds (hereafter "Denim & Diamonds" or "appellant") as a defendant. The amended complaint alleged that the nightclub's employees had sold alcoholic beverages to a visibly intoxicated Mr. Arnold, making Denim & Diamonds liable under Tennessee Code Annotated § 57-4-203(c)(1), part of the Dram Shop Act. It also alleged that Denim & Diamonds was guilty of negligence and recklessness in the supervision of its employees for allowing an intoxicated person to leave its premises behind the wheel of an automobile.

Denim & Diamonds filed an answer to the complaint, in which it asserted several affirmative defenses, including contributory negligence, comparative fault, and lack of causation. An amendment to the answer named Tennessee Protection Agency ("TPA") as a potential non-party tortfeasor. TPA was a private company that had been hired to provide security for the club. Denim & Diamonds alleged that Brett Arnold had been allowed to drive off in an intoxicated state because of the negligence of one of TPA's employees. Mr. Collins amended his complaint once again and named TPA as an additional defendant.

## II. THE JURY TRIAL

At the outset of the trial, Barry Arnold admitted that Brett Arnold had been negligent, although he disputed the severity of Mr. Collins' injuries. The basic facts of the accident were then established through the testimony of a police officer and a motorist who had called 911 after witnessing the collision. The officer testified that Mr. Arnold's Jeep Cherokee had apparently sideswiped a concrete barrier and a guard rail which separated the two directions of travel on the parkway, then hit a road sign and a utility pole before crossing a grassy median and striking Mr.

Collins' car going the other way. According to his testimony, there was nothing Mr. Collins could have done to avoid the accident.[1]

A forensic toxicologist interpreted the results of the autopsy performed on Brett Arnold, as well as the toxicology reports that were entered into evidence. He testified that the reported blood alcohol level of 0.119% showed that Arnold was intoxicated due to the influence of alcohol at the time of death.[2] He also testified that a man of Mr. Arnold's size (217 pounds) would have had to consume at least six to eight 12-ounce beers or an equivalent amount of alcohol over a period of about an hour in order to reach that level of intoxication.

The post-mortem tests also indicated the presence of metabolites of Valium and Xanax in the decedent's blood and urine, in quantities indicating abuse of those drugs. According to the toxicologist, the concentration and distribution of the metabolites showed that Mr. Arnold had taken those drugs six or more hours before his death. Under cross-examination, he acknowledged that Mr. Arnold might still have been feeling the effects of the drugs at the time of the accident, despite the passage of time. He further testified that the combination of those drugs with alcohol could have increased Mr. Arnold's impairment.

The witnesses to the events that occurred on the premises of Denim & Diamonds prior to the accident gave generally consistent accounts of most of those events, and we summarize them here. The proof showed that Denims & Diamonds was one of thirty-three clubs operated by Graham Brothers Entertainment. Denim & Diamonds is a large operation (30,000 to 40,000 square feet) with seven different bars, each with a separate entertainment theme and each in its own operating area. Uniformed security guards employed by defendant TPA patrol the premises and maintain order as necessary. The general manager of Denim & Diamonds has the authority to deploy the guards as he judges most effective, and he notifies TPA as to how many to send on any particular night.

On the night in question, the establishment was offering its customary long neck beer special. Patrons could pay $6 and then drink an unlimited number of long neck bottles of beer between the hours of 6:00 p.m. and 11:00 p.m. Brett Arnold was one of about 500 customers patronized Denim & Diamonds during the course of that night. Although it is unclear when he arrived at the club, he and another patron named Walkup got into an argument at around 10:00 p.m. After some hostile words passed between them, Mr. Arnold allegedly lifted a beer bottle in a threatening manner, and Mr. Walkup hit Mr. Arnold in the face with his fist. Mr. Arnold fell to the floor.

A security guard seized Mr. Walkup and brought him to the office of Mark Gangwer, the general manager of Denim & Diamonds. Brett Arnold had been knocked unconscious, and two security guards tried to rouse him. After a minute or two he regained consciousness. He was woozy

---

[1] Because the facts of the accident and the extent of Mr. Collins' injuries are not in dispute and not relevant to the issues on appeal, we need not recount the detailed testimony about the accident itself.

[2] The autopsy was performed eight or eight-and-a-half hours after Mr. Arnold's death. The toxicologist testified that with the cessation of circulation, metabolism and elimination that accompanies death, the blood alcohol concentration would have remained about the same as it was at the time of death.

and unsteady on his feet, and he needed the help of both guards to walk into the office of the manager.

Mr. Gangwer talked to both patrons and determined that neither wanted to press charges against the other. Mr. Walkup was told that he could go, and he left with his friends. However, it was apparent that Mr. Arnold was in no condition to drive; he was fidgety and nervous, and he had apparently told one security guard that he was not intoxicated but had been taking Xanax. The manager testified that he appeared to be under the influence of something other than alcohol and that it took a while for him to calm down.

The manager told Mr. Arnold he could not drive himself home and proposed several other possible options. Mr. Arnold was told that he could get a friend to drive him home, take a taxi (which Denim & Diamonds would pay for), or Mr. Gangwer could call a Metro police officer and Mr. Arnold could get a ride from him.[3]

Mr. Gangwer's offers were consistent with a set of printed policies that Denim & Diamonds followed for dealing with excessive intoxication by their patrons. One policy was to forbid employees from allowing anyone who was obviously intoxicated to be admitted to the premises. Another was to prevent intoxicated patrons from driving away while under the influence. Incident reports were supposed to be prepared to document problems with patrons, such as those arising from attempts to enforce those policies.

Mr. Gangwer testified that while Mr. Arnold was in his office, he made several calls to locate a friend or relative who would be willing to drive him home, but with no success. Mr. Arnold initially resisted the idea of a taxi because he did not want to leave his vehicle behind. However, after about 45 minutes in the office, he finally agreed. The manager called for a taxi, and when it arrived, he led Mr. Arnold out to the front of the building.

Mr. Arnold told Mr. Gangwer that he needed to get a few things out of his car. The manager used his lapel microphone and earpiece radio to call Aimee Kirby to escort Mr. Arnold to his car. She was one of four security guards on duty that night and was supervising the others. According to Ms. Kirby's testimony, Mr. Gangwer told her that Mr. Arnold needed a safe ride, but did not give her any details as to the reason he was being removed from the club. The manager then went back into the building. Ms. Kirby said that Mr. Arnold did not look like he was in a very good mood and that he seemed to be impaired, but he was not acting in an aggressive way.

At first, Mr. Arnold could not find his car, and had to use his key alarm to locate it. Every parking space in the vicinity of Mr. Arnold's car was filled, and there was only enough room for one person to walk sideways between the parked vehicles. Aimee Kirby testified that she followed Mr.

_____

[3]A security guard testified that this last choice was mostly offered to scare the customer into choosing one of the other options. The management did not like having the police come to the premises because it was considered bad for business.

-4-

Arnold towards his car. He opened the driver's side door, and as Ms. Kirby approached, he put his hands on her and pushed her down to the ground.[4]

Mr. Arnold then got into the car, locked the door, and started the engine. Ms. Kirby rose to her feet and tried to open the car door, but could not. She then ran to the rear of the car to get the license number, but Mr. Arnold threw the car into reverse, almost hitting her. She jumped out of the way "and pretty much had to roll underneath another car to keep him from hitting me." With brakes squealing and the vehicle fishtailing, he raced out of one of the four exits of the parking lot. Ms. Kirby did not get the license number and did not see in which direction he went. She then told Mr. Gangwer what had happened. He decided there was no point in calling the police to report the incident because ". . . there's nothing else we can do. He's gone."

The plaintiff called William Barton Butler as an expert witness. Mr. Butler is the founder of Rock Solid Security, a security agency with about 200 employees. He testified that the employees of Denim & Diamonds and TPA had committed numerous errors in the way they dealt with Mr. Arnold and that they had failed to follow sound security practices. Among other things, he claimed that Mr. Gangwer should have taken control of Mr. Arnold's car keys at the outset and should have conveyed more information to Aimee Kirby as to the reasons Mr. Arnold was being removed from the property, including the fact that he had been involved in a fight and had admitted to using drugs.

He further stated that two people should have escorted the customer to his car, both to maintain control over him and to provide for an additional eyewitness to protect the company from liability in the event of a later claim of mishandling or of theft of property from the car. He also testified that Mr. Arnold should never have been allowed to enter the car from the driver's side. The security guard should either have retrieved whatever item was needed herself or made Mr. Arnold access the car from the passenger side. Finally, he stated that the management should have called the police after Mr. Arnold fled from the parking lot.

Charles Grider, the owner of TPA, testified as to his own opinion of the proper way to deal with a situation like that presented by Mr. Arnold. His testimony indicated that his agency had about as many employees as Rock Solid Security, but that it did more nightclub work. He testified that it would be an unsound practice to take a customer's car keys away from him. He contended that such an act would be illegal because it would amount to theft and that it would leave the guard vulnerable to later accusations of tampering with the customer's car.

The testimony of several of TPA's employees closely echoed Mr. Grider's position. However, the deposition testimony of one security guard read into evidence contradicted this testimony. That witness testified that Denim & Diamond's usual practices included taking an

---

[4]An incident report filled out by Ms. Kirby that evening made no mention of her being pushed down by Mr. Arnold. The plaintiff first heard of the alleged assault when taking Ms. Kirby's deposition over a year later. Under questioning at trial, Ms. Kirby explained the discrepancy by saying that the incident left her unhurt, without any cuts or bruises, and that because she was a female, she thought the other guards and the management would not take her seriously if they knew that a drunk had been able to successfully overpower her.

intoxicated customer's keys away in the security office and holding onto them until he entered the taxi that had been called for him.

The jury found that Mr. Collins' damages amounted to $1,162,335.57 and that negligence by all three defendants contributed to Mr. Collins' injuries. Fault was apportioned among the defendants as follows: Brett Arnold, 30%; Denim & Diamonds, 40%; and TPA, 30%. The jury declined to find that Denim & Diamonds had been guilty of a violation of the Dram Shop Act. The jury also found that the plaintiff was entitled to punitive damages from both Denim & Diamonds and TPA.

The court conducted an additional hearing on punitive damages. At the conclusion of that hearing, the jury found that the plaintiff was entitled to punitive damages of $1.5 million against Denim & Diamonds and $250,000 against TPA. These two defendants had earlier filed motions for directed verdict on punitive damages, and they renewed those motions after the jury verdict was announced. The trial court denied the motions and affirmed the awards. A subsequent motion for new trial was likewise denied. This appeal followed.

On appeal, Denim & Diamonds challenges the allocation of liability to it on the grounds that the jury instruction incorrectly led the jury to hold it to a higher standard of care than the law required and that the actual apportionment of fault has no basis in the evidence. Denim & Diamonds also contends that the jury should not have been permitted to consider awarding punitive damages and/or that the trial court should not have affirmed the award because the facts of the case did not rise to the level required for such an award. Additionally, Denim & Diamonds objects to specific evidence whose erroneous introduction, it asserts, had a prejudicial effect on the verdict.

### III. THE BASIS FOR LIABILITY

Necessary to an analysis of the issues raised herein is a clear understanding and identification of the basis for the jury's finding of liability on the part of Denim & Diamonds. The plaintiff alleged various negligent acts as well as a violation of Tennessee's Dram Shop Act, which was, essentially, a claim that Denim & Diamonds negligently sold alcohol to an intoxicated Mr. Arnold.

Tennessee Code Annotated § 57-10-101 codifies the common law rule that an individual who furnishes alcohol to another is not liable for injuries resulting from the other's intoxication. *Biscan*, 160 S.W.3d at 473. An exception to this general rule, however, exists that applies to sellers of alcohol beverages, "dram shops," in certain specified situations. In order to find a party liable for injuries resulting from selling alcoholic beverages, a plaintiff must meet the standard described in Tenn. Code Ann. § 57-10-102, which provides as follows:

> Notwithstanding the provisions of § 57-10-101, no judge or jury may pronounce a judgment awarding damages to or on behalf of any party who has suffered personal injury or death against any person who has sold any alcoholic beverage or beer, unless such jury of twelve (12) persons has first ascertained beyond a reasonable

doubt that the sale by such person of the alcoholic beverage or beer was the proximate cause of the personal injury or death sustained and that such person:

(1) Sold the alcoholic beverage or beer to a person known to be under the age of twenty-one (21) years and such person caused the personal injury or death as the direct result of the consumption of the alcoholic beverage or beer so sold; or

(2) Sold the alcoholic beverage or beer to an obviously intoxicated person and such person caused the personal injury or death as the direct result of the consumption of the alcoholic beverage or beer so sold.

Accordingly, for a judgment to be entered against Denim & Diamonds on the claim based on sale of alcohol to Brett Arnold, the jury was required to find "beyond a reasonable doubt" that Mr. Arnold was obviously intoxicated and the sale of alcohol to him was the proximate cause of Mr. Collins' injuries. In the case before us, the Jury Verdict Form posed the relevant question:

Do you find beyond a reasonable doubt that Denim & Diamonds sold alcoholic beverages to Mr. Arnold while he was obviously intoxicated and that Mr. Arnold caused injury to Gordon Collins as the direct result of his consumption of the alcoholic beverages so sold?

Yes _____            No _____

While the jury answered all of the other questions on the Jury Verdict Form, no answer was provided by the jury to this particular question. It was left blank. Therefore, the jury did not make the affirmative finding required by the statute and, consequently, pursuant to Tenn. Code Ann. § 57-10-102, a judgment awarding damages against Denim & Diamonds for injuries resulting from the sale of alcoholic beverages could not be entered. In other words, Denim & Diamonds was not liable on the claim based on the Dram Shop Act.

The jury did indicate that it found Denim & Diamonds negligent and such negligence was the proximate cause of plaintiff's injuries. Since the finding of negligence cannot pertain to the sale of alcoholic beverages, it must be limited to other acts alleged to be negligent by the plaintiff. In other words, Denim & Diamonds' liability must be based on acts that resulted in Mr. Arnold driving away from the night club and proceeding to the point of the accident.

## IV. ISSUES RELATING TO LIABILITY

Denim & Diamonds has raised several issues challenging the verdict finding it negligent and liable for 40% of the compensatory damages. While several challenges relate to the apportionment

of fault and to the sufficiency of evidence to support a finding of any negligence by Denim & Diamonds, we begin our analysis with the arguments regarding the scope of duty.

The elements that must be proved to establish a claim for negligence have been stated many times. They are (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *Draper v. Westerfield*, 181 S.W.3d 283, 290 (Tenn. 2005); *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005); *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998).

Denim & Diamonds contends that the trial court misconstrued the element of duty in this case and that there was insufficient evidence of breach of the correctly defined duty of care on its part to sustain the apportionment of any fault to it or the share that was apportioned to it. The questions posed by these arguments are: (1) whether Denim & Diamonds was under a duty imposed by law or a duty it voluntarily assumed; (2) whether the scope of those duties differs significantly; (3) if they do differ, whether the jury instructions incorrectly directed the jury to apply a higher standard than the standard that was applicable; and (4) whether the evidence was sufficient to sustain the jury's allocation of fault to Denim & Diamonds for a breach of the applicable standard.

## A. DUTY

Whether a particular defendant owed a particular plaintiff a duty of care is a question of law, which we review *de novo*. *West v. East Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005); *Westerfield,* 181 S.W.3d at 290; *Coln*, 966 S.W.2d at 39. Generally, all persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others. *Biscan*, 160 S.W.3d at 478; *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997). In all cases, the duty owed to a plaintiff is that of reasonable care under all of the circumstances. *East Tenn. Pioneer Oil Co.*, 172 S.W.3d at 550.

The general duty to conform one's own conduct to a reasonableness standard so as to lessen the likelihood of injury to others does not, in most circumstances, impose a duty to control the conduct of others to the same end. *Biscan*, 160 S.W.3d at 478; *Lett v. Collis Foods, Inc.,* 60 S.W.3d 95, 99-100 (Tenn. Ct. App 2001) (holding that one generally does not have a duty to control the conduct of another so as to prevent that person from injuring a third party). Individuals "do not ordinarily have a duty to act affirmatively to protect others from conduct other than their own." *Nichols v. Atnip,* 844 S.W.2d at 655, 661 (Tenn. Ct. App. 1992) (citing RESTATEMENT (SECOND) OF TORTS § 314 (1964)).[5]

However, there are exceptions to this general statement of the law. One exception applies where the individual "stands in some special relationship to either the person who is the source of

---

[5]Similarly, courts have generally distinguished between action (or misfeasance) and inaction (or nonfeasance) in determining whether a duty exists. *Bradshaw*, 854 S.W.2d at 870.

the danger, or to the person who is foreseeably at risk from the danger." *Biscan*, 160 S.W.3d at 478-79 (quoting *Turner*, 957 S.W.2d at 818); *Bradshaw*, 854 S.W.2d at 871.

> [W]hile an actor is always bound to prevent his acts from creating an unreasonable risk to others, he is under an affirmative duty to act to prevent another from sustaining harm only when certain socially recognized relations exist which constitute the basis for such legal duty.

*Bradshaw*, 854 S.W.2d at 871 (quoting Harper & Kime, *The Duty to Control the Conduct of Another*, 43 Yale L. J. 886, 887 (1934)).

These principles are embodied in the Restatement, which has been cited in all Tennessee cases discussing duty arising from a special relationship. While § 314A of the Restatement gives several examples of such special relationships, which include those of innkeeper and guest, and possessors of premises open to the public and their invitees, that list is not exhaustive. Instead, in determining whether a special relationship exists so as to create an affirmative duty to act for the protection of a third party, Tennessee courts must "consider whether public policy and foreseeability favor recognizing a special relationship" as well as the remaining factors in the balancing test generally applied to determine whether a duty of care is owed in a particular situation. *Biscan*, 160 S.W.3d at 480.

That balancing test "attempts to align the imposition of a duty with 'society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another's act or conduct'" in order to determine whether all the factors favor the imposition of a legal duty. *Id.* (quoting *Bradshaw*, 854 S.W.2d at 870).[6]

The Tennessee Supreme Court applied that test in *Biscan* and determined that an adult host who allowed minors attending a party at his home to drink alcohol had a special relationship with the minor guests that imposed a duty to act with reasonable care to prevent them from being injured; specifically, in that case, to use reasonable care to prevent a minor guest from driving after drinking or leaving with a driver who had been drinking. *Id*. at 481-82. In finding that the adult host had a special relationship to his minor guests, *Id*. at 482, the court placed importance on the public policy, established by the legislature, against minors consuming alcohol as well as the foreseeability of the injuries sustained by the minor guest who left with an intoxicated minor driver. *Id*. at 480-81.

The Court also noted, however, that the total absence of the means or ability to control the guests would have precluded the finding of a special relationship, relying on *Lett*, 60 S.W.3d at 100

---

[6]The balancing test generally applied in considering whether a defendant owed a duty of care to a particular plaintiff includes the following factors: the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by the defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct. *Biscan*, 160 S.W.3d at 479; *McCall v. Wilder*, 913 S.W.2d 150, 153(Tenn. 1995).

and *Newton*, 970 S.W.3d at 493. *Biscan*, 160 S.W. 3d at 481. The court found, however, that an adult host "who is 'in charge' of a party held for minors . . . certainly has some ability to control the conduct of his guests." *Id*. The Court further stated that the adult host "did not have an absolute duty to control his guests; rather, he had an absolute duty to use ordinary care to control his guests and ensure their safety." *Id*.

After determining the existence of a special relationship between the defendant adult host and the injured minor guest, the Court considered the remainder of the factors in the balancing test. The Court recognized the apparent tension between the legislative determination that one who furnishes alcohol cannot, as a matter of law, be liable for injuries resulting from the consumption of that alcohol, as evidenced by Tennessee Code Annotated § 57-10-101,[7] and the imposition of a legal duty in the context of a social host who did not provide any of the alcohol that was consumed. *Id*. The Court resolved that tension, however, by holding that the duty of care the adult host owed his minor guests "lies separate and apart from furnishing alcohol. Because he knowingly permitted and facilitated the consumption of alcohol by minors, an illegal act, Worley had a duty to exercise reasonable care to prevent his guests from harming third persons or from befalling harm themselves." *Id*.

Although the Court referred to a duty to prevent the minor guests from harming third parties, the "special relationship" discussion centered on the relationship of the host and the minor guests, not on third parties such as the general motoring public. In other words, if a special relationship exists, the defendant may have a duty to control the conduct of the party who is the subject of the relationship so as to protect others from foreseeable harm. In the case before us, the party seeking to use the special relationship exception is Mr. Collins, who had no relationship to Denim & Diamonds and was simply a member of the general public.[8]

Mr. Collins asserts that Denim & Diamonds had a legally recognized special relationship with both himself and Brett Arnold on the basis of two other sections of the Restatement of Torts. He argues that §318 of the Restatement "recognizes a special relationship between a possessor of land and a licensee where the possessor of land had the 'ability to control' the licensee and knows of the 'necessity and opportunity for exercising such control.'" Section 318 establishes that a possessor of land or chattel has a duty to use reasonable care to control the conduct of a party whom the possessor allows to use the land or chattel so as to avoid harm to others. However, that duty

_____

[7]That statute provides:

> The general assembly hereby finds and declares that the consumption of any alcoholic beverage or beer rather than the furnishing of any alcoholic beverage or beer is the proximate cause of injuries inflicted upon another by an intoxicated person.

[8]As a general rule, a property owner does not stand in a special relationship with members of the general public who are not on their property. *See Newton v. Tinsley*, 970 S.W.2d 490, 493 (Tenn. Ct. App. 1997); *Atnip*, 844 S.W.2d at 662.

relates to controlling the use of the chattel or the activity on the land. RESTATEMENT (SECOND) OF TORTS § 318 cmt. *a* and *b*. It is not applicable in the case before us.

Similarly, Mr. Collins argues that Section 319 recognizes a special relationship "where a person 'takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled.'" Again, that section creates a duty in specific situations, and those situations are not present in the case before us. According to the comments, the rule in Section 319 applies in two situations: (1) where the actor has charge of a class of persons to whom the tendency to act injuriously is normal and (2) where the actor has charge of a person not in such a class but who has a peculiar tendency so to act that the actor knows or should know of. RESTATEMENT (SECOND) OF TORTS § 319 cmt. *a*. The examples of persons under such a duty are the operators of a hospital for contagious diseases or the operators of an institution for the mentally ill who know one of the inmates is a homicidal maniac. *Id.* Additionally, the Tennessee Supreme Court has declined to impose a duty on a commercial establishment to physically control an intoxicated driver to prevent him or her from leaving the premises. *East Tenn. Pioneer Oil Co.*, 172 S.W.3d at 552.

Since neither of the Restatement provisions specifically relied on by Mr. Collins applies in this case to establish a duty, the general rules regarding special relationships must be applied. As stated earlier, there is no duty to control the conduct of another person to prevent him from causing physical harm to someone else (a third party) unless (a) a special relation exists between the actor and the other person or (b) a special relation exists between the actor and the "someone else" that gives rise to a right of that third party to a right to protection.

We agree with Mr. Collins that the foreseeability of harm and the seriousness of potential harm associated with an intoxicated driver operating a vehicle on public streets is obvious. *East Tenn. Pioneer Oil Co.*, 172 S.W.3d at 551-52; *Burroughs v. Magee*, 118 S.W.3d 323, 332 (Tenn. 2003). In fact, the employees of Denim & Diamonds recognized that risk and gravity. Additionally, there is certainly a public policy against operating a vehicle while under the influence of intoxicants, as evidenced by legislation criminalizing such conduct.

However, we can find no authority for the proposition that the owners or employees of a commercial establishment have a special relationship with a customer or with the public that would impose upon that establishment a duty to control the conduct of an adult customer[9] to prevent his leaving the premises or driving while intoxicated.

In *East Tenn. Pioneer Oil Co.*, the Tennessee Supreme Court held that employees of a convenience store had a duty of reasonable care to persons on the roadways not to sell gasoline or to assist in providing gasoline to a person that the employee knows or ought to know is intoxicated and a driver. 172 S.W.3d at 552. However, the Court made clear that the duty of care did not arise out of any special relationship, but was imposed by weighing the relevant principles from the

_____

[9]The Supreme Court stated in *Biscan* that "public policy considerations favor imposing a duty to act for the protection of minors where such a duty might be absent when dealing with adults."

generally applicable rules regarding duty. *Id.* at 551. The Court specifically held that the plaintiff's claims were not based on a "'special relationship' arising from the sale of gasoline" to the intoxicated driver and that those claims did not

> revolve around any duty of the defendant to control the conduct of a customer. Instead, the claims are predicated on the defendant's employees affirmative acts in contributing to the creation of a foreseeable and unreasonable risk of harm, i.e., providing mobility to a drunk driver which he would otherwise not have had, thus creating a risk to persons on the roadways.

*Id*. Importantly, the Court specifically pointed out that "by our decision today we do not hold that convenience store employees have a duty to physically restrain or otherwise prevent intoxicated persons from driving." *Id*. at 552.[10]

Similarly, in *Lett v. Collis Foods, Inc*., this court held that a restaurant employer was under no duty to prevent an intoxicated employee from leaving in her own car. 60 S.W.3d 95. Not only did the court find no special relationship existed under various Restatement provisions relied on by the plaintiff who was injured in an accident with the intoxicated employee, it also found that the employer had taken no affirmative steps that facilitated the employee's negligent act of driving a vehicle while intoxicated. *Id*. at 104-05. The employer was presented with an employee who showed up intoxicated, tried to sober her up, had her clock out since she was unable to work, and tried to find someone who could take her home, but any desire to help her get home safely was "thwarted by [the employee's] determination to drive herself." 60 S.W.3d at 105.

Particularly relevant to the case before us were the court's statements regarding the employer's lack of legal control over the off-duty employee:

> [The employer] had no legal right to tie her up or "sit on her" or otherwise prevent her from driving away in her own car. From a legal standpoint, it did not have the means or ability to control its employee when she made the decision to drive a vehicle in her condition. . . . The employer's passive acquiescence in her leaving the premises and driving away in her own vehicle, acts they had no legal right to prevent, is simply not enough to impose a duty on this employer . . .

*Id.* at 105. This reasoning is consistent with the general principle that a defendant's duty to control the conduct of another depends in part on the defendant having the means and ability to control the third party. *Biscan*, 160 S.W.3d at 481; *Puckett v. Roberson*, 183 S.W.3d 643, 652 (Tenn. Ct. App. 2005). The analysis in *Collis Foods* recognizes that "means and ability" include not just the physical means and ability, but also the legal right to impose physical restraint.

---

[10].In *Biscan*, the Court, in response to the host's arguments, also stated that, "Reasonable care under the circumstances may not have included physically restraining his guests." *Biscan*, 160 S.W.3d at 482.

We conclude that Denim & Diamonds did not owe a duty to Mr. Collins or to other members of the motoring public to protect them from the actions of Brett Arnold by virtue of any special relationship. Additionally, we can find no other basis for deciding that Denim & Diamonds was under a legally-imposed duty to control the conduct of Mr. Arnold by physical restraint or otherwise.

Regardless of whether it had a duty to try to control Mr. Arnold's conduct for the protection of others, Denim & Diamonds did, in fact, try to stop Mr. Arnold from driving and does not dispute that once it made those attempts it was under a duty to use reasonable care. Once the management of the club determined that Mr. Arnold was so intoxicated that it would be unsafe to allow him to drive, and once they took steps to prevent him from doing so, they assumed the duty to act reasonably to accomplish that purpose. Denim & Diamonds itself acknowledges that it undertook to prevent Mr. Arnold from driving, detained him, and thereby assumed a duty to act with reasonable care to prevent him from harming others by driving.

Even though the law may not impose a duty to act, once a party voluntarily assumes a duty to act for the protection of others, he or she must then act reasonably. *Draper v. Westerfield*, 181 S.W.3d 283, 291 (Tenn. 2005) (distinguishing between a duty based on a special relationship and a duty that is assumed). "One who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully." *Bennett v. Trevecca Nazarene University*, 216 S.W.3d 293, 299 (Tenn. 2007); *Biscan*, 160 S.W.3d at 482-83; *Stewart v. State*, 33 S.W.3d 785, 793 (Tenn. 2000) (quoting *Marr v. Montgomery Elevator*, 922 S.W.2d 526, 529 (Tenn. Ct. App. 1995)). A party cannot relinquish that duty prematurely or perform it carelessly, or he or she will run the risk of being found liable for resulting injuries. *Biscan*, 160 S.W.3d at 483.

## B. JURY INSTRUCTIONS ON DUTY

Denim & Diamonds agrees that it assumed a duty once it detained Brett Arnold and that "its duty to do so with reasonable care has never been disputed." However, it argues that it was only required to exercise reasonable care and that the trial court misstated the extent of that duty in instructing the jury.

We must apply well-settled principles to the challenge to the jury instruction. The soundness of every jury verdict rests on the fairness and accuracy of the trial court's instruction. *Bara v. Clarksville Memorial Health Systems, Inc.*, 104 S.W.3d 1, 3 (Tenn. Ct. App. 2002). Since the instructions are the sole source of the legal principles needed to guide the jury's deliberations, trial courts must give substantially accurate instructions concerning the law applicable to the matters at issue. *State ex. rel Myers v. Brown,* 209 351 S.W.2d 385, 388 (Tenn. 1961).

However, jury instructions need not be perfect in every detail. *In re Estate of Elam,* 738 S.W.2d 169, 174 (Tenn.1987); *Benson v. Tennessee Valley Elec. Coop.*, 868 S.W.2d 630, 642-43 (Tenn. Ct. App. 1993). A single erroneous statement will not necessarily undermine otherwise proper instructions that, on the whole, fairly define the issues and do not mislead the jury. *Cortazzo v. Blackburn*, 912 S.W.2d 735, 745 (Tenn. Ct. App. 1995). Jury instructions must be viewed as a

whole, and the challenged portion of the instructions should be considered in light of its context. *Abbott v. American Honda Motor Co., Inc.*, 682 S.W.2d 206, 209 (Tenn. Ct. App. 1984).

A party seeking to set aside a jury verdict has a particularly heavy burden to carry, because our courts have a duty to uphold a jury verdict whenever possible. *Grandstaff v. Hawks,* 36 S.W.3d 482, 497 (Tenn. Ct. App. 2000); *Henshaw v. Continental Crescent Lines, Inc.*, 499 S.W.2d 81, 86 (Tenn. Ct. App. 1973). Accordingly, "we should not set aside a jury's verdict because of an erroneous instruction unless it affirmatively appears that the erroneous instruction actually misled the jury." *Grandstaff*, 36 S.W.3d at 497; *Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 84 (Tenn. Ct. App. 1996); *Carney v. Coca-Cola Bottling Works of Tullahoma*, 856 S.W.2d 147, 150 (Tenn. Ct. App. 1993).

Thus, a jury verdict may be reversed if it can be shown that a jury instruction contained an inaccurate statement of the law or was confusing, and that the instruction more likely than not affected the outcome of the trial. *Bara*, 104 S.W.3d at 3; *see also Richardson v. Miller*, 44 S.W.3d 1, 26 (Tenn. Ct. App. 2000) (failure to give jury instructions as to inferences to be drawn from missing evidence was not reversible error); *Helms v. Weaver*, 770 S.W.2d 552, 553 (Tenn. Ct. App. 1989) (citation of an inapplicable statute in a jury instruction was not reversible error).

In the case before us, the trial court gave the instruction on duty that Mr. Collins requested. Its language is derived from RESTATEMENT (SECOND) OF TORTS § 319:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

As discussed earlier, this provision, establishing one of the "special relationships" that creates a duty to control the conduct of others, does not apply to the factual circumstance presented in this case. It is derived from the Restatement section that applies to parties who are under a legally imposed obligation to control individuals who are likely to cause harm to others, such as the operators of a private hospital for contagious diseases or of a private sanitarium for the insane, and we have earlier determined this provision does not apply herein. *See* RESTATEMENT (SECOND) OF TORTS § 319.

Even though this Restatement provision does not apply herein, reversal on the basis of the instruction actually given is not justified unless the instruction is an inaccurate statement of the law or misleading or confusing and more likely than not affected the outcome of the trial.

Denim & Diamonds contends that the instruction that was given subjected them to a duty of extraordinary care and "more or less makes Denim & Diamonds the absolute guarantor of Plaintiff's safety." We do not agree with this characterization of the instruction. We see nothing in the language of the instruction that would have required the jury to impose a duty of extraordinary care, rather than reasonable care, on Denim & Diamonds. To the contrary, it specifically uses the phrase

-14-

"duty to exercise reasonable care." Nothing in this language would require a defendant to guarantee the safety of another, nor does it establish strict liability.

However, that does not end our analysis of the jury instruction issues, because Denim & Diamonds also raises the trial court's failure to give an instruction it requested. The instruction requested by Denim & Diamonds, and declined by the trial court, tracked verbatim § 324A of the Restatement, which pertains to voluntary assumption of a duty:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third party or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if:
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Denim & Diamonds argues on appeal that the court's failure to give its requested instruction was error that unfairly affected the result. A trial court should instruct the jury on every issue of fact and theory of the case that is raised by the pleadings and is supported by the proof. *Street v. Calvert*, 541 S.W.2d 576, 584 (Tenn. 1976); *Spellmeyer v. Tenn. Farmers Mut. Ins. Co.*, 879 S.W.2d 843, 846 (Tenn. Ct. App. 1993). More specifically, trial courts should give requested jury instructions where those instructions are supported by the evidence, embody the party's theory, and are correct statements of the law. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 445 (Tenn. 1992). Conversely, a trial court can refuse to give a requested charge to the jury if it is not supported by the evidence, its substance is already covered in the general charge, or it is incorrect or incomplete in any respect. *Ingram v. Earthman*, 993 S.W.2d 611, 635 (Tenn. Ct. App. 1998). Only when the denial of a requested instruction that could have been given under the previously stated rules prejudices the rights of the requesting party must this court vacate the judgment. *Souter v. Cracker Barrel Old Country Store, Inc.*, 895 S.W.2d 681, 684 (Tenn. Ct. App. 1994).

The Restatement provision that is the basis for the instruction requested by Denim & Diamonds applies specifically to parties who voluntary assume the duty to protect others from foreseeable risk. As we concluded earlier, that is the only type of duty that exists in this case. Consequently, the instruction requested by Denim & Diamonds was the more applicable of the requested instructions. The question is whether the requested instruction was a correct statement of the law whose omission prejudiced the rights of Denim & Diamonds.

Denim & Diamonds contends that there is a substantial distinction between the instruction that was given and the one that it requested. It argues that under the instruction it requested, it would only have been liable if its failure to exercise reasonable care, once it assumed a duty, increased the

-15-

risk of harm to the plaintiff. That is the wording of a portion of the Restatement provision on assumed duty, as repeated in the requested instruction.

There was at one time some question as to whether Tennessee had adopted that provision in its entirety as establishing the elements for liability under an assumed duty. With regard to Section 324A of the Restatement, this court observed in 2001, that it was "not entirely clear that Tennessee has adopted this section of the Restatement." *Lett v. Collis Foods*, 60 S.W.3d at 104. Tennessee courts have clearly adopted the rule that one who undertakes to act may become subject to the duty to act carefully. *Bennett* , 216 S.W.3d at 300; *Westerfield*, 181 S.W.3d at 291; *Biscan*, 160 S.W.3d at 482-83; *Stewart*, 33 S.W.3d at 793; *Marr v. Montgomery Elevator*, 922 S.W.2d 526, 529 (Tenn. Ct. App. 1995). Although many opinions recognize that duty, no Tennessee court has explicitly adopted Section 324A as establishing the only situations under which liability attaches.

However, the Tennessee Supreme Court has quoted and applied the conditions set out in Restatement §324A(a)-(c) in a context indicating that those conditions establish the applicable bases for liability when there has been a breach of the assumed duty of reasonable care. In *Biscan*, the Supreme Court rejected an argument by the defendant that since the minor guests had not relied on his protection, he could not be liable under the assumption of a duty rationale. *Biscan*, 160 S.W.3d at 483. As set out above, reliance is one of the three alternatives set out in Section 324A. In rejecting that argument, the Court stated that the defendant could have been liable if any of the three conditions in Section 324A were present, not just reliance.[11] *Id*.

While the Court did not explicitly state it was adopting Section 324A as establishing conditions for imposition of liability in an assumption of duty situation, its application of those conditions indicated its adoption of the entirety of Restatement § 324A. We conclude that, if confronted with the question directly, the Court would hold that Section 324A, including subsections (a) through (c), establishes the law in Tennessee regarding liability under a duty that is voluntarily assumed. *See Gaines v. Excel Indus., Inc*., 667 F.Supp. 569, 571 (M.D. Tenn. 1987)(finding that a Tennessee court, when faced with the appropriate situation, would "apply the Restatement formulation").

Essentially, subsections (a) through (c) of Section 324A establish additional requirements, beyond a failure to act with due care, for liability to attach to a party who assumes a duty and tries, although unsuccessfully, to prevent harm to others. In the case before us, the requirement at issue is found in subsection (a), that the failure of the party who undertook to protect another to exercise reasonable care "increases the risk of such harm." This requirement is consistent with public policy. Without this requirement, the law would deter people from trying to prevent harm to another when they are under no legal duty to do so because they might incur liability they would not otherwise face. Rather than subjecting such parties to liability for merely failing to use reasonable care in such an attempt, subsection (a) requires that the unsuccessful efforts have increased the risk of harm. In

---

[11]The Court had already decided that the minor guests had, as a matter of fact, relied on the defendant's rule regarding drinking at parties, so the Court did not examine whether either of the other conditions was shown to apply.

other words, Section 324A(a) ensures that liability continues to rest with the primary actor or tortfeasor unless the intervening party's attempts increase the danger to others over that posed by the primary actor's conduct.

Herein, Section 324A(a) would require proof that Denim & Diamonds' conduct in certainly delaying and attempting to prevent Mr. Arnold from driving in his impaired condition made the risk of harm to the motoring public greater or more likely than if Denim & Diamonds had done nothing. More to the point, had the jury been instructed on Section 324A (a), it would have been required to determine whether the conduct of Denim & Diamonds' employees in detaining Mr. Arnold while trying to arrange a ride for him increased the risk that he would drive in an impaired condition and harm others. The jury was not given that instruction, and therefore did not make the analysis necessary to finding Denim & Diamonds liable under Section 324A.

Based on the record before us, we cannot conclude that the jury's finding of liability for negligence on the part of Denim & Diamonds would not have been different had it been given the instruction requested by Denim & Diamonds. To the contrary, we hold that the failure to give the requested instruction, more likely than not, affected the outcome of the trial. We must, therefore, reverse the verdict and the judgment based thereon.

In addition to his arguments in support of the instruction that was given, Mr. Collins argues that, even if the "increase the risk of harm" instruction should have been given, Denim & Diamonds' conduct did, in fact, increase the risk of Mr. Arnold speeding away and harming others. Because the jury was not given the instruction, it did not have the opportunity to decide whether there was sufficient evidence that Denim & Diamonds' attempts to keep Mr. Arnold from driving increased the risk of harm to others. Consequently, we cannot on appeal determine whether the evidence would support such a jury finding. The question must be submitted to the factfinder first.

### C. FINDING OF NEGLIGENCE

Separate and apart from its arguments regarding the scope of any duty it was under, Denim & Diamonds argues that, even if the "increase the risk" requirement did not apply, it could not be held liable for negligence. It asserts that there was insufficient proof that it breached its duty to use reasonable care, even under the instruction given by the trial court, to prevent Mr. Arnold from driving away or from harming himself or others. In the interest of judicial economy, we will address those arguments.

"Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. Rule 13(d). *See also Barnes v. Goodyear Tire & Rubber Co.,* 48 S.W.3d 698, 704 (Tenn. 2000). In determining whether there is material evidence to support a verdict, the appellate court must: (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all countervailing evidence. *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006); *Barnes*, 48 S.W.3d at 698; *Crabtree Masonry Co. v. C & R Construction, Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

Appellate courts shall neither re-weigh the evidence nor decide where the preponderance of the evidence lies. If the record contains "any material evidence to support the verdict, [the jury's findings] must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury."

*Barnes*, 48 S.W.3d at 704 (citations omitted).

Having thoroughly reviewed the record, we find that it contains material, albeit disputed, evidence to support the jury's verdict finding Denim & Diamonds liable for negligence as instructed by the trial court. The testimony set out earlier in this opinion details some of that evidence. Among other things, the jury could have found the following acts or omissions as falling below the standard of reasonable care and contributing to the accident: the failure to require that more than one security officer escort him to his car; the failure to advise the security officer of all the circumstances; and the failure to notify the police that an impaired and potentially dangerous driver had left the parking lot.

## D. THE ALLOCATION OF FAULT

In this appeal, Denim & Diamonds also challenges the jury's allocation of fault among the defendants. Since we have found that the verdict must be reversed, we are not required to address this issue. However, in the interest of economy for the parties, the trial court, and any reviewing court, we will consider the issue of the jury's allocation of fault. Denim & Diamonds' argument on this issue, and our analysis of the issue, address the verdict found by the jury under the instruction that did not include the requirements of Section 324A of the Restatement.

Tennessee has adopted a system of modified comparative fault for tort litigation. *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992). Under that system, liability may be allocated among defendant tortfeasors in proportion to their degree of fault, so long as the plaintiff's negligence is less than that of the defendant or defendants. *McIntyre*, 833 S.W.2d at 57. In the case before us, the defendants concede that the plaintiff was without fault, and that there was nothing he could have done to avoid the injuries that were caused by the fault of others.

Although Denim & Diamonds continues to object to any liability for negligence on its part, it also specifically challenges the jury's allocation of fault, which it describes as "incomprehensible." Denim & Diamonds argues that under the facts of this case, either Brett Arnold should have been held primarily responsible for his actions or TPA should have been found to bear a greater degree of responsibility than Denim & Diamonds for allowing him to retrieve his car and drive it off. It contends that since the actions of Brett Arnold were the direct cause of the plaintiff's injuries, allocating a greater degree of fault to Denim & Diamonds than to Mr. Arnold defies all sense or reason.[12]

---

[12]In support of this argument, the defendant relies heavily on an unpublished opinion of this court, *Morgan v. State*, No. M2002-02496-COA-R3-CV, 2004 WL 170352 (filed January 27, 2004) (No Tenn. R. App. P. 11

(continued...)

Denim & Diamonds also argues that it made no sense for the jury to allocate a greater degree of fault to it than to TPA. It notes that TPA was responsible for the training of its own employees, that it chose which of those employees to send to the various clubs for which it provided security, that a TPA employee was charged with the duty of safely escorting Brett Arnold to his car, and that she was the one who made it possible for Mr. Arnold to escape.

While these facts are undisputed, Denim & Diamonds ignores other facts which show the role it played in the sequence of events that led to the plaintiff's injuries. Mark Gangwer, the bar's manager, exercised the ultimate responsibility over the daily operation of the club and had authority over both Denim & Diamonds' own employees and the employees of TPA. Mr. Gangwer determined how many security guards to ask TPA for, and he had the authority to deploy them as needed. He also had superior knowledge of Brett Arnold's condition and behavior, having observed him for forty-five minutes in his office. Finally, Denim & Diamonds and its manager were in the position to alert police to the danger posed by Mr. Arnold, thereby having a final opportunity to prevent injuries.

In the final analysis, the allocation of fault under Tennessee's system of comparative fault is a matter for the jury to decide. *Brown v. Wal-Mart Discount Cities*, 12 S.W.3d 785, 789 (Tenn. 2000); *Ward v. Glover*, 206 S.W.3d 17, 35 (Tenn. Ct. App. 2006); *LaRue v. 1817 Lake, Inc.*, 966 S.W.2d 423, 427 (Tenn. Ct. App. 1997). A reviewing court will not set aside a jury's allocation of fault if it is supported by any material evidence. *Braswell v. Lowe's Home Centers, Inc.*, 173 S.W.3d 41, 43 (Tenn. Ct. App. 2005).

> The process of ascertaining the evidentiary support for a jury's verdict is very deferential toward the verdict. The reviewing courts must (1) take the strongest legitimate view of the evidence that favors the verdict, (2) assume the truth of all the evidence that supports the verdict and (3) allows all reasonable inferences that sustain the verdict.

*Id.* (citing *Kelley v. Johns*, 96 S.W.3d 189, 194 (Tenn. Ct. App. 2002)).

Again, if the jury were not required to consider the "increase the risk of harm" condition for liability under an assumed duty, then we conclude there was material evidence in this case to support the jury's conclusion that all three defendants had acted negligently. Under the facts presented, it is conceivable that the jury could have allocated fault among the defendants in different proportions than it did. But there was nothing illogical or "incomprehensible" about the jury's allocation of fault.

## V. PUNITIVE DAMAGES

---

[12](...continued)
application filed), in which we stated that a party's voluntary intoxication did not relieve her from the responsibility for her own negligence. *Morgan*, 2004 WL 170352 at *8. We do not disagree with that well-settled principle, and it was obviously applied herein since a portion of the liability was assigned to Mr. Arnold.

The jury awarded, and the trial court approved, punitive damages against Denim & Diamonds, which award Denim & Diamonds asserts was error. We have already determined that the finding of negligence must be reversed because of an omission in the jury instructions. That conclusion necessarily requires reversal of the punitive damage award.

However, we feel it prudent to address the arguments raised by Denim & Diamonds regarding the propriety of the award of punitive damages in the even our conclusion regarding Restatement Section 324A and the jury instructions is reversed. Additionally, should the case be retried, some guidance with regard to punitive damages is in order.

The leading case in Tennessee governing the award of punitive damages is *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992). In *Hodges*, the Tennessee Supreme Court decided to "reexamine and modify" the manner in which punitive damages are awarded in Tennessee. *Id.* at 900. The Court's decision to revamp punitive damage law resulted from the Court's concerns that "unlimited jury discretion . . . in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id.* (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991)).

After discussing the history of punitive damages in Tennessee, the Court concluded that the "contemporary purpose" of punitive damages is to both punish the wrongdoer and deter others from behaving the same way. *Hodges*, 833 S.W.2d at 900. Unlike other types of damages, punitive damages are not designed to compensate the plaintiff. *Id.* The Court found that the litany of offenses that once merited a punitive damage award were vague and overbroad.[13] *Id.* at 900-01. Consequently, the Court decided to "restrict the awarding of punitive damages to cases involving only the **most egregious of wrongs**." 833 S.W.2d at 901 (emphasis added). Examples cited by the Court in *Hodges* include "conscious action of a reprehensible character" and "malicious commission of a tort." *Id.*

Considering the twin purposes of protection and deterrence, the Court in *Hodges* decided to restrict the availability of punitive damages in order to avoid "dull[ing] the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct." *Hodges*, 833 S.W.3d at 901. Consequently, a court can award punitive damages "only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously or (4) recklessly." *Id.* The parties herein agree that the issue here is whether Denim & Diamonds met the fourth ground, namely whether its behavior was reckless.[14]

---

[13]At the time of the *Hodges* decision, Tennessee law allowed punitive damages in cases involving "fraud, malice, gross negligence, evil motives, conscious indifference and reckless conduct implying 'disregard of social obligation.'" *Id*. at 900-01.

[14]A review of the definitions of the other three grounds helps to illuminate the degree to which the Court meant to restrict the availability of punitive damages.

(continued...)

In a further attempt to limit the availability of punitive damages "only in the most egregious of cases," the Court in *Hodges* also required proof of one of the four grounds by clear and convincing evidence. *Id*. at 901.

> This higher standard of proof is appropriate given the twin purposes of punishment and deterrence: fairness requires that a defendant's wrong be clearly established before punishment, as such, is imposed; awarding punitive damages only in clearly appropriate cases better effects deterrence.

*Id.* In order to avoid confusion about the standard in this context, the Court defined "clear and convincing evidence" to mean "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.*

In addition to the substantive proof to be presented, the Court in *Hodges* also addressed the procedural framework. When punitive damages are alleged, the trial is to be bifurcated so that in the first phase the factfinder shall determine whether the defendants are liable for punitive damages under the stringent standards enunciated.[15] The amount of damages shall then be determined in the

---

[14](...continued)
A person acts **intentionally** when it is the person's conscious objective or desire to engage in the conduct or cause the result. *Cf.* T.C.A. § 39-11-302(a) (1991) (criminal definition of "intentional"). A person acts **fraudulently** when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. *See First Nat'l Bank v. Brooks Farms*, 821 S.W.2d 925, 927 (Tenn. 1991). A person acts **maliciously** when the person is motivated by ill will, hatred, or personal spite.

*Id*. (emphasis added).

[15]The factfinder is to be instructed that "the primary purpose" of punitive damages is to "deter misconduct" and must consider, to the extent they are relevant, at least the following factors:

(1) The defendant's financial affairs, financial condition, and net worth;
(2) The nature and **reprehensibility** of defendant's wrongdoing, for example
    (A) The impact of defendant's conduct on the plaintiff, or
    (B) The relationship of defendant to plaintiff;
(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;
(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;
(5) The expense plaintiff has borne in the attempt to recover the losses;
(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;
(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;
(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(continued...)

immediate second phase. Thereafter, the trial judge is to review any award of punitive damages "giving consideration to all matters on which the jury is required to be instructed." 833 S.W.2d at 902. As part of the review, the trial court "shall clearly set forth the reasons for . . . approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed." *Id*.

It is abundantly clear that the Supreme Court made every attempt to structure a procedure for consideration of punitive damages that would result in their award only in cases where the behavior is so reprehensible that it must be both punished and deterred. *See Culbreath v. First Tenn. Bank Nat'l Ass'n*, 44 S.W.3d 518, 529 (Tenn. 2001) (holding bank's conduct was "reprehensible" supporting punitive damage award); *Metcalfe v. Waters*, 970 S.W.2d 448, 452 (Tenn. 1998) (holding attorney's "repeated transgressions and callous disregard" for clients supported punitive damages in attorney malpractice case).

It is against this backdrop that the appropriateness of the award of punitive damages against Denim & Diamonds is to be measured. The very high standards detailed above must be applied only to the conduct of Denim & Diamonds employees in attempting to prevent Mr. Arnold from injuring others by driving in his impaired condition. As explained earlier in this opinion, the jury did not find that Denim & Diamonds had any liability related to furnishing alcohol. Just as Denim & Diamonds cannot be liable for compensatory damages based on conduct related to serving alcohol, it cannot be liable for punitive damages based on that conduct. By statute, because the jury did not find that Denim & Diamonds was liable under the statutory exception to the Dram Shop Act, the jury could not have awarded and the trial judge could not have approved punitive damages against Denim & Diamonds based upon it selling alcohol to Mr. Arnold. Tenn. Code Ann. § 57-10-102. Consequently, any alleged recklessness relating to the furnishing of alcohol is not relevant to the analysis of the punitive damage award and cannot be considered as a justification of that award.

That distinction is important because of arguments made by Mr. Collins as to the basis for finding that Denim & Diamonds acted recklessly. He argued below, and argues on appeal, that Denim & Diamonds was guilty of misconduct or reckless or reprehensible conduct, but the examples of such conduct all relate to the service or sale of alcohol. While the causes of action based on sale of alcohol were viable when the case went to the jury, the jury's verdict eliminated them as a basis for liability for either compensatory or punitive damages.

In its Memorandum Opinion, the trial court adopted some of Mr. Collins' arguments and included in Denim & Diamonds's "reprehensible conduct" the fact that Denim & Diamonds was aware that 90% of its customers left intoxicated and that Denim & Diamonds ran the beer specials

---

[15](...continued)
(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Hodges*, 833 S.W.2d at 901-02. (emphasis added).

without adequate staff. That is conduct relating to the cause of action based on serving alcohol. Thus, to the extent the trial court relied on that conduct as a ground for punitive damages, such reliance is prohibited by Tenn. Code Ann. §57-10-102.

Additionally, the fact of the matter is that Denim & Diamonds's employees recognized Mr. Arnold's impaired condition, regardless of how he arrived at that state. They recognized the risk he posed and attempted to remove that risk. In other words, Mr. Arnold did not leave without his intoxication being perceived. Therefore, any knowledge on the part of the club employees about other patrons leaving intoxicated has no relevance to any negligence in Mr. Arnold's situation. For the same reasons, the manner in which the club ran its beer specials is also irrelevant to the recklessness or misconduct in how the employees attempted to prevent his leaving.

As the trial court recognized, the negligence finding by the jury herein was based on the efforts of Denim & Diamonds' employees to prevent Mr. Arnold from driving and in failing to immediately call the police when he left. The question, therefore, is whether that conduct meets the stringent test for recklessness justifying an award of punitive damages. The Court in *Hodges* defined recklessness as follows:

> A person acts **recklessly** when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances. *Cf.* T.C.A. § 39-11-302(c) (1991) (criminal definition of "reckless").

*Hodges*, 833 S.W.2d at 901 (emphasis added).[16]

The Tennessee Supreme Court in *Doe v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 37-41 (Tenn. 2005), recently had occasion to discuss the concept of recklessness in the context of the tort of outrageous conduct. The *Doe* court cited the above quoted *Hodges'* definition of "recklessly" and then proceeded to elaborate on its meaning. The Court in *Doe* defined "disregards"

---

[16]The Court also directed us to compare the definition of reckless for purposes of punitive damages with the definition used in our laws defining criminal conduct. *Id*. A comparison leads to the obvious conclusion that the definitions are almost identical. Tenn. Code Ann. § 39-11-302(c) defines "reckless" as follows:

> (c) "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

to mean "to give no thought to: [to] pay no attention to." *Doe*, 154 S.W.3d at 37 (quoting Webster's Third New Int'l Dictionary 655 (1971)).[17]

Thus, in order to act recklessly, a defendant must disregard or pay no attention to a substantial risk. The proof showed that Denim & Diamonds did not ignore the threat posed by Mr. Arnold driving in his impaired condition. To the contrary, the employees took significant steps to address this risk. They put a lot of time, effort and attention into deterring Mr. Arnold from driving his vehicle. The fact that once the club's employees undertook to act they did so negligently is not tantamount to recklessness.

As the jury is to be instructed, "the primary purpose" of punitive damages is to "deter misconduct" *Hodges*, 833 S.W.2d at 901. The Court in *Hodges* was clear that punitive damages were aimed at reprehensible conduct and misconduct. The conduct of Denim & Diamond's employees in attempting to prevent Mr. Arnold from driving off was simply neither misconduct nor reprehensible. While their efforts were unsuccessful, they were not reckless.

Accordingly, we conclude that the award of punitive damages must be reversed.

## VI. Objections To Trial Proceedings

Denim & Diamonds also asserts that errors in the conduct of the trial would justify a reversal of the verdict and a remand for new trial. Although we have already determined that reversal is required on another ground, we will nonetheless address the issues raised by Denim & Diamonds so as to reduce the possibility of another review by this court and to provide guidance for a retrial. In reviewing the alleged errors, we must consider the requirement of Tennessee Rule of Appellate Procedure 36(b) that a final judgment "shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."

### A. Admission of Prior Complaints

Denim & Diamonds objected to the admission of two (2) complaints initiating lawsuits previously filed against it. The attorney for the plaintiff played excerpts from the videotaped deposition testimony of a corporate officer of Graham Brothers Entertainment, Denim & Diamonds' parent company. Among other things, he acknowledged that the club's "free beer nights" were an important part of its operations, that they were still continuing, and that management had never considered eliminating them. He also testified that by offering unlimited beer between 6:00 and

---

[17]As the Court in *Doe* found, "Recklessness is a hybrid concept which resembles both negligence and intent, yet which is distinct from both and can be reduced to neither." *Id*. at 39.

11:00 p.m., the club drew customers in earlier, and that with contests and other entertainments, the customers would stay around longer and start paying full price for other alcoholic beverages.

Plaintiff's attorney was also allowed to read into evidence two prior complaints against Denim & Diamonds for accidents caused by drunk drivers leaving their premises. A 1994 complaint involved the death of an underage drinker. A 1996 complaint alleged serious injuries to a motorcycle rider from collision with a car driven by an intoxicated Denim & Diamonds customer. The trial court conducted a jury-out hearing, during which Denim & Diamonds argued that the introduction of those complaints would be irrelevant and misleading, since the complaints only amounted to allegations and the cases never resulted in final judgments against Denim & Diamonds.

The plaintiff argued that the complaints were relevant because the fact that they were filed provided notice to Denim & Diamonds as to the possible dangers arising from its unlimited beer special. After discussion, the judge ruled that the complaints would be admitted for identification only, and he informed the jury that the allegations were never proved as true, that no final judgment had been entered finding Denim & Diamonds at fault, and that the jury could consider them in its discretion only as some kind of notice to Denim & Diamonds of the degree of risk involved in the way it conducted its business.

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *Biscan*, 160 S.W.3d at 468; *Mercer v. Vanderbilt University*, 134 S.W.3d 121, 121 (Tenn. 2004). A trial court abuses its discretion "only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *Id.* (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)).

Evidence is relevant and therefore admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence that is relevant under Rule 401 "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ." Tenn. R. Evid. 403. The court must therefore balance the probative value of the evidence and the potential prejudice to the objecting party.

Denim & Diamonds argues that the allegations of the two complaints were completely irrelevant to the present case because neither complaint involved facts similar to those in the present case, *i.e.*, an unsuccessful attempt to prevent an intoxicated customer from driving away from its premises. It also argues that the complaints caused unfair prejudice by inflaming the jury against Denim & Diamonds. The plaintiff contends, to the contrary, that the complaints were relevant to both his claim under the dram shop laws and his claim for punitive damages.

At the time the complaints were offered into evidence, the claim based on the exception to the Dram Shop Act, as well as the claim based on negligence in preventing Mr. Arnold from leaving, were still viable. So was the claim for punitive damages based on reckless conduct in the sale of

alcohol. Knowledge of prior incidents where customers left intoxicated was relevant to the recklessness standard.

Mr. Collins directs our attention to several cases from other jurisdictions where the trial court allowed the plaintiff to introduce evidence of prior claims or lawsuits against the defendant solely for the purpose of establishing that the defendant had prior notice of possible defects, dangers or wrongdoing. For example, the plaintiff in *Skil Corp v. Lugsdin*, 309 S.E.2d 921, 922-23 (Ga. Ct. App. 1983), was injured while operating an electric saw which he claimed was defective. The court allowed the admission of testimony as to numerous informal complaints or lawsuits involving the same defect in the same or similar models of saw.

In *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Circuit 1987), a landowner claimed that a uranium exploration subcontractor had trespassed on his land and assaulted him. He was allowed to introduce evidence of seven previous complaints of trespass brought by the plaintiff's neighbors against the same subcontractor. Although the earlier incidents did not involve assaults and they each arose out of separate events and transactions, the court ruled that they were admissible, in part to prove that the incident at issue was not just a one-time mistake or accident but part of a pattern of reckless conduct, and thus relevant to the plaintiff's claim for punitive damages.

*Purcell v. Zimberlman*, 500 P.2d 335, 343-45 (Ariz. Ct. App. 1972), involved a claim of medical malpractice against a hospital and several doctors. The plaintiff was allowed to admit evidence that the defendant surgeon had been named as a defendant in several other malpractice suits. Although none of those suits involved the claim at issue, the court held that they were relevant to the claim against the hospital for allowing the surgeon to maintain privileges in its facilities, despite its knowledge of his possible incompetency. In each of the above cases, the appellate court affirmed the lower court's judgment and its use of such evidence for the purposes it stipulated.

In the case before us, we conclude that the prior complaints had some relevance to the issues presented to the jury. The question, therefore, is whether their prejudice outweighed whatever probative value they may have had.

The trial court was clearly aware of the danger of prejudice from the reading of the complaints, but rather than shielding the jury from any knowledge of them, he instead chose to limit their prejudicial effect in several ways. He ruled that the complaints would be admitted for identification only, and thus they did not accompany the other exhibits to the jury room during deliberations. He also informed the jury that the allegations were never proved as true, that no final judgment had been entered finding Denim & Diamonds at fault, and most importantly, that the jury could consider them in its discretion only as some kind of notice as to the degree of risk involved in the way Denim & Diamonds conducted its business.

We conclude that the trial court did not abuse its discretion in allowing admission of the prior complaints and limiting the jury's consideration of them.

In any event, we cannot conclude that the introduction of the complaints, with the limiting instruction, even if improper, more probably than not affected the outcome of the trial. The jury declined to find Denim & Diamonds liable for serving alcohol to Mr. Arnold while he was intoxicated. Consequently, we must conclude that the jury was unaffected by the information that on two prior occasions patrons of the bar had driven while intoxicated after leaving the bar. We have set aside the punitive damages award.

## B. A Stale Conviction

During cross-examination of Mark Gangwer, Denim & Diamonds' manager and primary witness, it was disclosed that Mr. Gangwer had been convicted of a crime thirteen years earlier. Denim & Diamonds argues that this information was improperly disclosed to the jury and affected the verdict. The series of events leading to the disclosure is as follows:

On cross-examination, the plaintiff's attorney asked Mr. Gangwer if he had a permit with the Tennessee Alcohol and Beverage Commission. Mr. Gangwer answered that he did. The attorney then had his permit application placed on the overhead projector and the following exchange ensued:

Q. One of the questions on the permit is – I'll read it to you. "Have you or any person employed by you in the sale or dispensing of alcoholic or malt beverages ever been convicted of any violation of any law against possession, sale, manufacture, or transportation of intoxicating liquor or any crime involving moral turpitude." That's a copy of your application. And you answered "No."

A. Right.

Q. Is that a correct statement, Mr. Gangwer?

A. Which, the – any crime of moral turpitude.

Q. That's not a correct statement, is it?

A. No.

Q. Because in 1990 you were convicted of a felony in Florida of lewd and lascivious assault on a child under the age of 14; correct?

A. Yes.

Q. That's correct isn't it?

A. Yes, it is.

Q.    So this statement that you made to the Tennessee Alcoholic Beverage Commission was incorrect?

A.    Yes.

Q.    Lewd and lascivious assault on a child under the age of 14 involves moral turpitude, doesn't it Mr. Gangwer?

A.    I guess so, yes.

At that point, the attorney for Denim & Diamonds objected, and the court ordered a jury-out hearing. In chambers, the Denim & Diamonds' attorney asked for a mistrial, and asserted that the introduction of Mr. Gangwer's conviction was in violation of Rule 609 of the Tennessee Rules of Evidence, which regulates the use of evidence of conviction of a crime to impeach a witness. Under section (b) of that rule, evidence of a conviction that is more than ten years old is admissible **only**

> ...if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs the prejudicial effect.

Tenn. R. Evid. 609(b).

Mr. Collins contended, however, that Rule 609 did not apply in this case, since it was not the evidence of Mr. Gangwer's crime that was used to impeach him, but rather his failure to disclose his conviction in his application to the Tennessee Alcoholic Beverage Commission, which was signed under oath in July of 2000.

He argued that the applicable rule of evidence was Tenn. R. Evid. 608, which regulates evidence of the character and conduct of a witness. Under that rule, evidence of specific incidents of conduct that is probative solely of truthfulness or untruthfulness also requires a hearing outside the jury's presence. For the evidence to be admitted, the court must, upon request, determine that "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. Rule 608(b)(1).

The trial court listened to arguments for both sides and found that the plaintiff had not followed the substance of Rule 609 and should have given prior notice of his intentions to the other side. The judge also commented on the practical situation he faced, stating, "the cat is out of the bag, the skunk has been thrown to the jury."

However, the trial court ruled that if the evidence had been presented through appropriate notice to Denim & Diamonds and then referred to the court, the court would have allowed it, because the evidence was extremely relevant to the question of the witness's credibility, which was of critical

-28-

importance to the outcome of the case because of his central role in the events leading up to the accident.

The court refused to grant a mistrial, ordered that the permit application be admitted for identification only, and declared that the plaintiff's attorney could ask only one follow-up question on the matter. The attorney's question was "Mr. Gangwer, is it true that you lied on your ABC application that you filed in July of 2000 for a permit to serve alcohol by failing to list a felony conviction?" The witness answered in the affirmative. He then testified in detail as to the operations of the club he managed, the measures it used to monitor the sobriety of its patrons, and his recollection of the events on the night of the accident.

On appeal, Denim & Diamonds renews its Rule 609 objection to the use at trial of Mr. Gangwer's old conviction. In addition to challenging the correctness of its admission, Denim & Diamonds complains that if it had been given advance notice of the intended use of the conviction and of the court's willingness to allow the jury to learn of it, it could have followed a different trial strategy, perhaps choosing not to call Mr. Gangwer as a witness at all.

For his part, Mr. Collins renews his argument under Rule 608, emphasizing that the relevant conduct for the purpose of that rule was Mr. Gangwer's untruthful answer on his permit application, not the earlier conviction that rendered the answer untruthful. He also insists that Denim & Diamonds itself put the honesty and integrity of its star witness at issue by prompting him to offer a generous helping of self-serving testimony about his background as an explorer scout and other experiences to depict himself as a virtual police officer.[18]

There are two separate components of the testimony at issue here.[19] The first is the evidence regarding Mr. Gangwer's untruthful or incorrect answer on the application. The second is the disclosure of the actual prior conviction and its nature. Mr. Collins has always maintained that the questions at issue were aimed at eliciting evidence that was relevant to Mr. Gangwer's credibility, and that was the sole purpose of the questions. Both Rule 608(b) and Rule 609 of the Tennessee Rules of Evidence govern the admissibility of prior conduct for the purpose of impeaching a witness's credibility. However, only one of the rules specifically addresses prior criminal convictions, and that is Rule 609. Specific instances of prior conduct, other than convictions, are addressed in Rule 608(b).

_____

[18]When Mark Gangwer was called to the stand, the attorney for Denim & Diamonds first asked him whether he had a background in law enforcement. He answered that he did, and that,

...when I was out of high school I was involved in the Police Explorers in Melbourne [Florida]. My mother was a dispatcher at the police department, and I basically went through all the training like a police officer would such as how to handle a domestic dispute, traffic investigation, basically all the same things a police officer would cover. And I was involved in the Ride Along Program, which I actually went out on patrol with officers and got to participate in different activities.

[19]Of course, the actual statements about the conviction itself were made by counsel in his question. Since the witness affirmed the fact and nature of the conviction, we will describe it as testimony or evidence.

Rule 609(a) provides the conditions under which "evidence that a witness has been convicted of a crime" may be admitted "[f]or the purpose of attacking the credibility" of that witness. On the other hand, Rule 608(b) covers the admission of "[s]pecific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, **other than convictions of crime as provided in Rule 609**." (emphasis added.) Accordingly, the admissibility of the prior misrepresentation on the application must be determined by reference to Tenn. R. Evid. 608(b), while the admissibility of the information regarding the conviction and the nature of the offense must be measured by the requirements in Tenn. R. Evid. 609.

We first examine the questions regarding Mr. Gangwer's answer on the ABC application. Rule 608(b) provides in pertinent part:

> Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:
>
> (1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;[20]

Thus, Rule 608(b) describes when, and under what conditions, specific instances of conduct may be used to impeach a witness if they reflect on the truthfulness or untruthfulness of the witness. Neil P. Cohen, Sarah Y. Sheppeard, and Donald F. Paine, *Tennessee Law of Evidence* § 6.08[2] Specific instances of conduct may be asked about on cross-examination, but only if certain procedures are followed, specifically a jury-out hearing to assess whether there is a reasonable factual basis for the inquiry and whether the alleged conduct has probative value. *Id*. at § 6.08[4].

The specific conduct at issue herein was Mr. Gangwer's untruthful answer on his ABC application. The plaintiff asked about that conduct on cross-examination without requesting a jury-out hearing and without giving notice to the defendant so that it could request such a hearing. One of the conditions that must be satisfied before inquiry can be made into specific instances of conduct

---

[20]Subsection (b)(2) deals with prior bad acts more than ten years old and is, therefore, not relevant here. It requires notice to the adverse party of the intent to use the evidence and requires that the court determine that the probative value of the evidence substantially outweighs its prejudicial effect.

probative of truthfulness is that the court conduct a jury out hearing and make the determinations set out in Tenn. R. Evid. 608(b)(1). *State v. Reid*, 91 S.W.3d 247, 303 (Tenn. 2002) (Tenn. Crim. App. opinion appendix).

Although the rule does not specify whose responsibility it is to make the request for a hearing, courts have held that the party seeking to use the evidence must make the request.[21] *State v. Philpott,* 882 S.W.2d 394, 404 (Tenn. Crim. App. 1994); *State v. Davis*, 741 S.W.2d 120, 123 (Tenn. Crim. App. 1987); *Tennessee Law of Evidence* § 6.08[7][b]. "The purpose of the hearing is to eliminate the possibility that the jury will hear the question and its response before a judge has the opportunity to rule." *Philpott,* 882 S.W.2d at 404 (citing *Tennessee Law of Evidence* § 6.08.3, at 265). By not requesting a Rule 608(b)(1) hearing, the plaintiff herein frustrated the trial court's ability to further that purpose.

Although the courts have indicated that the failure of the party seeking to use specific acts of prior conduct to impeach the truthfulness of a witness to request a hearing as required by the rule constitutes error on the part of the questioning party and is to be disapproved by the courts, that failure has not necessarily resulted in reversal because of other circumstances surrounding the questioning and any objection thereto or curative action. *See, e.g., Philpott*, 882 S.W.2d at 404; *State v. Peoples*, No. E2005-001110CCA-R3-CD, 2006 WL 74150 (Tenn. Crim. App. Oct. 25, 2005) (perm. app. denied May 30, 2006).

At the jury-out hearing that was held after the evidence was heard by the jury, the trial court conducted the analysis set out in Tenn. R. Evid. 608(b)(1). Our review of the trial court's decision to admit the evidence after that analysis is reviewed under an abuse of discretion standard. *State v. Reid*, 91 S.W.3d at 303. We agree there was a reasonable factual basis for asking Mr. Gangwer if his answer to the application question regarding prior convictions was correct. The purpose of the requirement that there be a reasonable factual basis before permitting an inquiry into prior specific acts is "to ensure that such questions are proposed in good faith, rather than in an effort to place before the jury unfairly prejudicial information supported only by unreliable rumors." *State v. Nesbit*, 978 S.W.2d 872, 882 (Tenn. 1998). Herein, Mr. Gangwer immediately admitted his application answer was incorrect.

We also agree that the fact that his application answer was false is probative of his truthfulness or lack thereof. Consequently, we agree with the trial court that, had the plaintiff requested a timely jury-out hearing, the inquiry into the false answer on the application would have been admissible to impeach the credibility of Mr. Gangwer. We also cannot conclude that the trial court abused its discretion in allowing the evidence even though the plaintiff had not requested a jury-out hearing before asking about the prior answer on the application.

---

[21]Since the plaintiff in this case had not apparently given notice to the defendants of his intent to use the impeaching evidence, the defendant would have had no basis upon which to request a jury-out hearing before the question was asked.

However, the questioning did not stop with the application answer. Instead, counsel for Mr. Collins asked specifically about the prior conviction, giving the details of that conviction. At the point the witness acknowledged that his answer on the application was not a correct statement, the evidence probative of the witness's character for truthfulness was established. The witness responded "No" to the question of whether his prior answer to the application question regarding prior convictions was correct.[22] The actual crime and the date of the conviction did not add any information relevant to impeachment of the witness's credibility. Having established the fact that Mr. Gangwer had misrepresented the facts on the application, the plaintiff was not authorized by Rule 608 to ask the next question regarding the conviction or to rely on that rule to justify his failure to comply with Rule 609.[23]

As explained above, the language of Rule 608(b) specifically excludes criminal convictions, stating that the admissibility of such convictions is governed by Rule 609. While Rule 608(b) allows inquiry into specific instances of prior conduct that may be a criminal offense, "acts that were a criminal offense and were the object of a criminal conviction must be introduced pursuant to Rule 609 rather than Rule 608. Rule 609 covers criminal convictions for impeachment." *Tennessee Law of Evidence* § 6.08[4].

Under the applicable rule, evidence of a prior conviction may be admitted to impeach a witness's credibility if the crime is a felony or a crime involving dishonesty or a false statement. Tenn. R. Evid. 609(a)(2). However, a conviction that is more than ten years old[24] is not admissible unless (1) the party seeking to use the conviction gives the other party advance notice of its intent to use the conviction, and (2) the court determines that the probative value of the conviction, supported by the facts and circumstances, outweighs its prejudicial effect. Tenn. R. Evid. 609(b). Subsection (b) creates a presumption against admission, and the burden is on the party seeking to use the conviction to prove that the probative value outweighs the prejudice. Tennessee Law of Evidence § 6.09[6][e].

---

[22]Rule 608 expressly prohibits introduction of extrinsic evidence of prior bad acts, so the plaintiff could not, under that rule, introduce documents establishing the conviction, regardless of whether Mr. Gangwer had admitted or denied that his answer on the application was incorrect. *See Sneed v. Stovall*, 22 S.W.3d 277, 281 (Tenn. Ct. App. 1999). If the conviction had been properly offered under Rule 609, and if the trial court's decision to admit the conviction under that rule were correct, however, a copy of the adjudicating documents could have been introduced. Tenn. R. Evid. 609(a)(1).

[23]Further, where a party inquires during cross-examination about specific instances of prior conduct for impeachment purposes, "the witness should be asked about the act itself, not about rumors, arrests, charges, or indictments for the act." *Philpott*, 822 S.W.2d at 404 (quoting *Tennessee Law of Evidence* § 6.08.3, at 267). While the question herein was not about a conviction for the act of lying on the ABC application, the principle nonetheless is consistent with Rule 608's explicit exclusion of conviction evidence.

[24]The ten year time period runs from the date of release from confinement where the witness was sentenced to incarceration and from the date of conviction where no incarceration was imposed. Tenn. R. Evid. 609(b). In the case before us, the plaintiff does not argue that subsection (b) does not apply because the witness was released from confinement fewer than ten years earlier.

In the case before us, the plaintiff did not give the notice required by the rule and did not request a hearing outside the jury's presence to give the court an opportunity to make the required determination before the question revealing the conviction and the nature of the offense was asked and answered.

At the jury-out hearing requested immediately after the subject inquiry, the court first examined the question of whether the plaintiff was required to give notice of his intent to use the prior misrepresentation and/or the prior conviction. The court determined that Rule 609 required that such notice be given, since the conviction was more than ten years old, and that the plaintiff should have given that notice. The court then proceeded to conduct the jury-out hearing that should have occurred prior to the disclosure of the conviction to determine "whether the Court would have let this out." [25]

The trial court determined that he would have allowed the evidence had the required notice been given and a hearing held before the evidence was revealed to the jury. The court found that "this evidence, if it had been produced . . . through notice to the defendant would have been allowed by the Court. It is relevant as to the issue of credibility." Defendants requested a limiting instruction,[26] which was denied, and a mistrial, which was also denied.

In its ruling on Denim & Diamond's motion for a new trial, the trial court stated:

. . . it is the opinion of the Court that under Rule 608 and 609 that plaintiff should have given opposing side notice of this prior conviction and should have had a hearing outside of the jury's presence. Even though there was a jury out hearing, by that time, the skunk had already been thrown to the jury and even if it had been determined that the evidence should have been excluded it was already too late. There is no doubt that this impeachment evidence weighed heavily in the jury's mind when reaching their verdict.

Even though the evidence was not properly introduced, this evidence was relevant and was probative of the manager's truthfulness. Therefore, if done correctly, this evidence would have been allowed in. The jury would have, therefore, heard the statements made either way. For these reasons, a new trial should not be granted on these grounds.

A trial court's ruling on the admissibility of a prior conviction for impeachment purposes is reviewed under an abuse of discretion standard. *Waller*, 118 S.W.3d at 371. Appellate review of

[25] Counsel for defendants argued that the lack of timely notice put the defendants at a great disadvantage in terms of the analysis under Rule 609 as well as the trial strategy adopted. Counsel for defendants were unaware of the conviction.

[26] They specifically asked that the court instruct the jury that plaintiff's counsel should not have gone into the matter without giving the court and the parties prior notice and that it was extremely improper.

a discretionary decision includes determining whether the trial court correctly applied the appropriate legal standards and based its decision on the preponderance of the evidence. D v. K, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995).

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

Under Rule 609(b) evidence of a stale conviction is not admissible unless the court determines that the probative value of the conviction outweighs its prejudicial effect. Tenn. R. Evid. 609(b). Appellate courts have reviewed decisions to admit a stale conviction to determine whether the jury-out hearing "actually developed specific facts and circumstances to justify admission of the evidence. A summary conclusion is clearly inadequate." *Tennessee Law of Evidence*, § 6.09[6][d] (citing *State v. Lingrel*, 692 S.W.2d 41(Tenn. Crim. App. 1985)).

With regard to the regard to the required analysis, "[t]wo criteria are especially relevant in determining whether the probative value of a conviction on the issue of credibility outweighs its unfair prejudicial effect upon the substantive issues: (1) the impeaching conviction's relevance as to credibility; and (2) the impeaching conviction's similarity to the offense charged." *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003) (citing *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999)). A trial court should first determine whether the impeaching conviction is relevant to the issue of credibility, because a felony conviction *per se* is not necessarily probative of credibility. *Waller*, 118 S.W.2d at 371. In determining how probative a conviction is to the issue of truthfulness, the trial court must assess whether the offense involves dishonesty or a false statement. *Id.*

In the case before us, the trial court did not explain the reasoning underlying its conclusion that the conviction was relevant and probative of the witness's truthfulness. The reason behind the balancing standard to be applied to old convictions, and the general inadmissibility of such convictions, is that criminal conduct in the distant past may have little bearing on a witness's current credibility. *Tennessee Law of Evidence* § 6.09[6][a]. We cannot agree with the trial court's conclusion that the nature of the conviction was probative of Mr. Gangwer's truthfulness. Nothing was produced in the hearing to show that the offense, or the facts and circumstances surrounding it, involved dishonesty or false statement. Thus, we cannot find that the trial court applied the correct legal standards in reaching its probity determination.

The disclosure of the nature of the offense, however, was highly prejudicial because it was described by plaintiff's counsel as "lewd and lascivious assault on a child under the age of 14." The trial court itself recognized this disclosure was likely on the minds of the jury during their

deliberation. Nonetheless, the trial court did not weigh the prejudice against the probity. Its decision to admit the evidence was based on its finding that the evidence was relevant and probative, and was not the result of its application of the test of whether the probative value as to credibility **substantially outweighed** its prejudicial effect. Consequently, the trial court did not apply the correct legal standards. Based on our review of the record, we cannot conclude that the probative value of the evidence regarding the conviction substantially outweighed its prejudicial effect. Accordingly, the ruling to admit the evidence of the old conviction was in error.

Our inquiry does not, however, end here. As discussed earlier, under Tennessee Rule of Appellate Procedure 36(b) a final judgment "shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Based upon our review of the entire record, we cannot say that the introduction of Mr. Gangwer's prior conviction more probably as not affect the jury's determination of liability for negligence in allowing Mr. Arnold to drive away in an impaired condition, the amount of compensatory damages awarded, or the allocation of fault among the defendants. These determinations are supported by evidence in the record and do not appear to have been affected by any prejudice created by the nature of the offense underlying the conviction. Whether or not such prejudice more likely than not affected the award of punitive damages against Denim & Diamonds is an issue we need not reach since we have vacated that award on another basis.

### C. Juror Misconduct

One of the grounds raised by Denim & Diamonds in its motion for a new trial was juror misconduct. According to Denim & Diamonds, one of the jurors brought extraneous prejudicial information into jury deliberations. The plaintiff, on the other hand, argued that the evidence regarding juror misconduct was not admissible and, alternatively, that no misconduct occurred. In its Memorandum Opinion, the trial court denied the motion and found that there was no juror misconduct.

Denim & Diamonds introduced several affidavits from jurors discussing the behavior of one particular juror. During the jury deliberations, one of the jurors disclosed that she had a relationship with a police officer and implied that through this relationship she had discovered that the defendant could have done more to prevent the accident. She also intimated that she knew something about the case she was not supposed to know but did not disclose any additional information.

Whether and to what extent a juror may testify about juror behavior and deliberations is governed by Tennessee Rule of Evidence 606(b), which provides as follows:

(B) **Inquiry Into Validity of Verdict or Indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, **except that a juror may testify** on the question of whether extraneous prejudicial

-35-

information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. (emphasis added).

Clearly, as a general rule jurors may not testify about a verdict, and no affidavit or evidence about a juror may be presented. *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005). There are, however, three quite narrow exceptions to this general rule. Under these exceptions, evidence from a juror may be admitted to impeach a verdict only if there has been "(1) extraneous, prejudicial information, (2) outside influence, or (3) antecedent agreements to be bound by a quotient or majority result." *Caldararo v. Vanderbilt University*, 794 S.W.2d 738, 742 (Tenn. Ct. App. 1990). As explained by this Court in *Caldararo*, this rule and its exceptions represent a "compromise" between competing public policies. *Id*. at 741. It allows the courts to protect the integrity of the process from verdicts "tainted" by information outside the record and outside influence. *Id*.; *Walsh v. State*, 166 S.W.3d at 646. At the same time, the sanctity of jury deliberations is protected. *Id*. at 741-42.

Denim & Diamonds relies upon the extraneous prejudicial information exception found in Rule 606(b) to question the verdict. The burden of introducing evidence sufficient to support a finding that Rule 606(b) has been satisfied rests with Denim & Diamonds. *State v. Stinnett*, 958 S.W.2d 329, 330 n.5 (Tenn. 1997). If this burden is met, then a rebuttable presumption of prejudice arises and the burden shifts the other party to explain the conduct or demonstrate it was harmless. *Walsh*, 166 S.W.3d at 647.

We believe that this matter is analogous to the facts in *Caldararo*.[27] The Caldararos sued Vanderbilt Hospital claiming that injuries to Mr. Caldararo were caused by the attending nurses' misdiagnosis of his condition and their failure to provide timely aid. 794 S.W.2d at 740. Mr. Caldararo, a diabetic, had a heart attack that resulted in severe brain damage. *Id*. After a jury trial, a verdict was returned for Vanderbilt Hospital. *Id*. The Caldararos filed a motion for a new trial contending that the jury foreman acted improperly during deliberations. According to the affidavit of two jurors, the jury foreman repeatedly told them during the trial that he was married to a nurse and also described how he believed a nurse would examine a patient with diabetes. *Id*. at 740-41. The trial court denied the Caldararos' motion, and this court affirmed.

---

[27]Since *Caldararo* was decided before the effective date of Tenn. R. Evid. 606(b), it was decided under Fed. R. Evid. 606(b) which was incorporated into Tennessee law in *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984). *Caldararo*, 794 S.W.2d at 741. The federal rule is almost identical to Tenn. R. Evid. 606(b), *Walsh*, 166 S.W.3d at 648, n.3, except it does not list the ground involving a quotient or gambling verdict. *Walsh*, 166 S.W.3d at 646, n. 1 This ground, however was recognized by Tennessee at the time of *Caldararo*. 794 S.W.2d at 742. In all other respects relevant to the case, the federal rule and Rule 606(b) are the same, making the *Caldararo* decision applicable to the interpretation of Tenn. R. Evid. 606(b).

The appellate court noted that if a party is seeking a new trial based on alleged jury misconduct, the first step is to satisfy the trial court that there is admissible evidence on the issue. *Id*. at 741. In order to be "extraneous information" it must be "information from a source outside the jury." *Id*.

External influences that could warrant a new trial if found to be prejudicial include: (1) exposure to news items about the trial, (2) consideration of facts not admitted in evidence, and (3) communications with non-jurors about the case. *Government of Virgin Islands v. Gereau*, 523 F.2d at 149-50; *United States v. Blackston*, 547 F.Supp. at 1217. Internal influences that are not grounds to overturn a verdict include: (1) discussions among jurors, (2) intimidation or harassment of one juror by another, (3) a juror's personal experiences not directly related to the litigation, and (4) a juror's subjective thoughts, fears, and emotions. *United States v. Norton*, 867 F.2d 1354, 1366 (11th Cir. 1989); *United States v. Krall*, 835 F.2d 711, 716 (8th Cir. 1987); *Carson v. Polley*, 689 F.2d 562, 581 (Former 5th Cir. 1982); *United States v. Duzac*, 622 F.2d 911, 913 (5th Cir. 1980).

*Id*. at 742.

While under the exception, a juror may testify to establish the fact of extraneous information or improper influence, testimony about the effect of such information or influence on the deliberative process is nevertheless still inadmissible. *Walsh*, 166 S.W.3d at 649. It is for the court to determine "whether there is a reasonable possibility that the communication altered the verdict." *Walsh*, 166 S.W.3d at 649, (quoting *Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 917 (7th Cir. 1991)).

The court in *Caldararo* did not believe that the juror making reference to his wife's occupation that then imputed to him an understanding of nursing entitled the Caldararos to a new trial, stating:

Jurors must render their verdict based on the evidence introduced at trial. *See Citizens' St. Ry. v. Burke*, 98 Tenn. 650, 653, 40 S.W. 1085, 1085 (1897); *Stone v. O'Neal*, 19 Tenn. App. 512, 519, 90 S.W.2d 548, 552 (1936). However, they are permitted to weigh the evidence in light of their own knowledge and experience. *See High v. Lenow*, 195 Tenn. 158, 168, 258 S.W.2d 742, 746 (1953). Thus, trial courts routinely instruct juries, as the trial court did in this case, that "you are not required to set aside your common knowledge . . . as you have the right to weigh the evidence in light of your own observations and experiences." *See* 8 Tenn. Prac. *Tennessee Pattern Jury Instructions-Civil* 1.15.

It is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). Thus, it would be unreasonable, and perhaps unwise, to expect juries to be completely sterilized and free of any external influences. The

jurors' various attitudes, philosophies, experiences, and backgrounds are the "very human elements that constitute one of the strengths of the jury system." *United States v. McKinney*, 429 F.2d 1019, 1022-23 (5th Cir. 1970), *cert. denied*, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).

Accordingly, jurors are not required to be completely ignorant about a case, and a verdict will not be overturned because of jurors' generalized knowledge of the parties or of some other aspect of the case. *Government of Virgin Islands v. Gereau*, 523 F.2d at 151; *Garcia v. State*, 777 P.2d 603, 608 (Wyo. 1989). A juror's personal experiences unrelated to the litigation are not external information. *Martinez v. Food City, Inc.*, 658 F.2d at 374; *United States v. Duzac*, 622 F.2d at 913. However, a juror's personal experiences directly relating to the parties or events directly involved in the litigation may be. *Hard v. Burlington Northern R.R.*, 870 F.2d 1454, 1462 (9th Cir. 1989).

*Id*. at 743-744.

We affirm the trial court's denial of the motion for new trial on the ground of juror misconduct.

## VII. CONCLUSION

We reverse the judgment against Denim & Diamonds for both compensatory damages and punitive damages. The case is remanded for further proceedings consistent with this opinion. The costs of this appeal are taxed to the appellee, Gordon Collins.

PATRICIA J. COTTRELL, JUDGE